IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SAFECO INSURANCE COMPANY OF INDIANA, | § § § | |
| | § | NO. AU-14-CV-587-DAE |
| Counter-Plaintiff, | § § | |
| vs. | § § | |
| CHARLES IGWE, | § § | |
| Counter-Defendant. | § | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

On February 18, 2016, the Court held a bench trial in the above-captioned matter. Laura D. Tubbs, Esq., appeared at the trial on behalf of Counter-Plaintiff Safeco Insurance Company ("Safeco"). Leonard F. Green, Esq., appeared at the trial on behalf of Counter-Defendant Charles Igwe.

On May 7, 2014, Igwe filed suit against Safeco in the 274th Judicial District of Hays County, Texas alleging claims for breach of contract and violations of the Texas Insurance Code in connection with Safeco's failure to fully pay two claims made under Igwe's homeowner's policy. ("Compl.," Dkt. # 1, Ex. A.) Safeco removed the claim to this Court on the basis of diversity jurisdiction. (Dkt. # 1 at 1.)

1

On July 20, 2015, Safeco filed a Second Amended Answer, raising a counterclaim for fraud in connection with Igwe's second claim. (Dkt. # 14 ¶¶ 35–37.) On July 24, 2015, Safeco filed a Motion for Summary Judgment. (Dkt. # 15.) On October 27, 2015, Magistrate Judge Andrew W. Austin issued a Report and Recommendation finding that Safeco's Motion for Summary Judgment should be granted. (Dkt. # 27.) Judge Yeakel adopted the Report and Recommendation on November 16, 2015. (Dkt. # 37.) Safeco's counter-claim against Igwe, for damages resulting from alleged fraudulent cost of living claims, was the only issue remaining for trial.

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, because there is complete diversity among the parties, and the total amount in controversy is in excess of $75,000.00.

The Court has considered the record evidence submitted, made determinations as to relevance and materiality, assessed the credibility of the witnesses, and ascertained the probative significance of the evidence presented. Upon consideration of the above, the Court finds the following facts by a preponderance of the evidence, and in applying the applicable law to such factual findings, makes the following conclusions of law. To the extent any findings of fact as stated may also be deemed to be conclusions of law, they shall also be considered conclusions of law; similarly, to the extent any conclusions of law as

stated may be deemed findings of fact, they shall also be considered findings of fact.  See Compaq Computer Corp. & Subsidiaries v. C.I.R., 277 F.3d 778, 781 (5th Cir. 2001).

I.     FINDINGS OF FACT

### The Parties

1.     Counter-Plaintiff Safeco is an insurer whose state of incorporation is Illinois and whose principal place of business is Massachusetts.  (Dkt. # 1 ¶ 5.)

2.     Counter-Defendant Igwe is an individual who resides in Hays County, Texas.  (Compl. ¶ 1.)

### The Insurance Contract

3.     The Insurance Contract between Igwe and Safeco obligates Safeco to pay for Igwe's living expenses in the event that the premises where he resides is rendered uninhabitable for a period of time due to an event covered by the policy.  The policy reads:

> If a loss covered under this Section makes that part of the *residence premises* where you reside uninhabitable we cover **Additional Living Expense**, meaning any necessary increase in living expenses you incur so that your household can maintain its normal standard of living.

("Policy," Def. Ex. D-1 at 45, Coverage D (1) (emphasis in original).)

4.     The Policy also contains language permitting Safeco, in the event of fraud committed by the insured, to void coverage under the policy, deny coverage

3

for a claim, or require reimbursement for payments that have already been made on the claim. The policy reads:

> This policy was issued in reliance upon the information provided on your application. We may void coverage under this policy if you or an *insured* have concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, at the time application was made or any time during the policy period.
>
> We may void this policy or deny coverage for a loss or *occurrence* if you or an *insured* have concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, in connection with the presentation or settlement of a claim.
>
> We may void this policy or deny coverage because of fraud or material misrepresentation even after a loss or *occurrence*. This means we will not be liable for any claims or damages which would otherwise be covered. If we make a payment, we may request that you reimburse us [sic] if so, you must reimburse us for any payments we may have already made.

(Policy at 59, Property and Liability Conditions (2) (emphasis in original).)

5. The aforementioned policy language is not in dispute.

### The Insurance Claim

6. On March 10, 2011, Igwe reported a loss to Safeco Insurance due to water damage; representations Igwe made to Safeco in connection with this claim are at issue in the instant trial. (Compl. ¶ 6.)

7. Igwe lived outside of his home while Safeco assessed and repaired the water damage. (Dkt. # 14 ¶ 36.) Pursuant to Igwe's homeowner's insurance policy, Safeco made "loss of use" payments under the policy; some payments were

made directly to Igwe, and others were made to CRS Temporary Housing on his behalf. (Dkt. # 14 ¶ 36; Def. Exs. D-2, D-3, & D-6.) The payments covered temporary housing and meals for the time Igwe was out of his home. (Policy at 45; Dkt. # 14 ¶ 36.)

### Counter-Defendant's Conduct

8.  Safeco began covering Igwe's hotel expenses on March 10, 2011, the day Igwe reported his water loss claim. (Def. Ex. D-6.) At trial, Rod McAtee, a senior inside claims property specialist who has been employed at Safeco for thirty-seven years, testified that hotels are meant to be a temporary housing option while a longer-term option, such as a condo or rental home, is secured. Safeco contracts with CRS Temporary Housing ("CRS") to locate such housing.

9.  On March 14, 2011, Igwe e-mailed Autumn Hassen at CRS, stating that the housing option they had offered Igwe was unworkable because the 1800 square foot space was "not functional" and had "little to no yard," as well as limited parking. (Def. Ex. D-12 at 1.). On April 19, 2011, Igwe received an e-mail from Mr. Hassen, explaining that CRS had located a three-bedroom condominium in New Braunfels. Ms. Hassen stated that the condominium "has a pool for the kids, it's next to the river and it's close to the Schlitterbahn Waterpark." (Def. Ex. D-11 at 1.) On April 26, 2011, Igwe rejected the option, stating that the condo was

"much too small and the bed room [sic] situation/layout is NOT workable." (Id. (emphasis in original).)

10. On June 6, 2011, Igwe again e-mailed Ms. Hassen rejecting the housing option they had recently offered him, stating that the "home was not suitable **mainly** for size and security and safety of my family." (Def. Ex. D-9 at 1 (emphasis in original).) The e-mail further stated, "[a]nd to make sure that we are all on the same page and that there are no confusions, here is the info I gave to the local agent . . . My Family: SIX in total, My wife and I, 4 children (3 boys and 1 girl)." (Id. (emphasis in original).)

11. On October 24, 2011, Gary Mowatt, a Hotel Specialist at CRS, e-mailed Igwe regarding a hotel relocation option, because the Embassy Suites where Igwe was living was closing for renovations on October 28, 2011. (Def. Ex. D-8 at 1–2.) Igwe rejected the hotel option provided, stating that he required "a double bedroom and a connecting room," because "we have minor children to include a very young girl who could and would not stay in a separate/non-connecting room." (Id. at 1.)

12. During the trial, Igwe admitted that his wife and children were living in San Antonio, and only visited him on weekends or when school was out. This directly contradicts the representations Igwe made on multiple occasions to Safeco, and to the housing specialists at CRS.

13. On August 15, 2011, Igwe sent an e-mail to Rod McAtee, the claims adjuster who was assigned to Igwe's water loss claim and took over handling the claim in June 2011, with the subject line "per diem for all for Rod Mctee [sic]" requesting reimbursement for per diem expenses incurred on behalf of himself, his wife, and his two minor children, for the time period between March 10, 2011, and July 25, 2011. (Def. Ex. D-4 at 1.) A spreadsheet attached to the e-mail requests a per diem reimbursement for breakfast, lunch, dinner, and incidentals for each person for each day during that time period. (Def. Ex. D-4.)

14. At trial, Igwe testified that he received this per diem spreadsheet from McAtee, and that he was instructed to submit a request for daily allowances using this form for each of the people whom he was responsible. However, Igwe also testified at trial that he created the form that he sent to McAtee, and that he did not provide three meals a day to his wife and children between March 10, 2011, and July 25, 2011, even though he claimed reimbursement for doing so.

15. Igwe testified at trial that he requested the two hotel rooms because he needed enough space to keep his children's clothing and belongings there for their visits, and because two rooms was barely enough space to live. However, he also testified that he was being reimbursed for the mileage he drove between the hotel and his home in Buda for the purpose of obtaining clothes and various items he needed from time to time.

7

## Counter-Plaintiff's Conduct

16. Safeco compiled an investigative report regarding Igwe's water damage claim on April 18, 2011; the report stated that Igwe's children do not live with him at all times. (Pl. Ex. D-5 at 2.) Tammy Luttrell, a Safeco employee, filed notes on April 19, 2011, stating that Igwe's children did not live with him full time, and that two hotel rooms are not needed at all times. (Pl. Ex. D-6 at 1.) A second investigative report, filed on June 17, 2011, also states that Igwe's wife and children only visit on the weekends, and that he and his wife are separated, "but that they are working on it." (Pl. Ex. D-7 at 1.)

17. At trial, McAtee testified that he took over Igwe's claim in June of 2011, and that he was aware of the investigative reports stating that Igwe's children did not live with him at all times. However, McAtee stated that Igwe's statements regarding his familial situation were different from those compiled in the report, and that he relied on Igwe's statements when authorizing payment for per diem expenses and two hotel rooms. McAtee testified that he would not have authorized payment for two hotel rooms per day if not for Igwe's representations that his family was living with him.

18. On September 2, 2011, McAtee sent a letter to Igwe advising him that he was being paid $17,200 in per diem expenses to reimburse him for the costs allegedly accrued on behalf of his wife and two minor children for the time period

between March 10, 2011, and July 25, 2011.  (Def. Ex. D-5 at 1.)  The letter was attached to a spreadsheet which detailed that the $17,200 per diem amount was calculated by allotting $4,300.00 per person to cover daily meal expenses for Wilma, Chinedu, Chima, and Charles Igwe.  (Def. Ex. D-5.)  The letter further advised Igwe that he was required to submit receipts to receive reimbursement for expenses incurred after July 25, 2011.  (Def. Ex. D-5 at 1.)  Finally, the letter informed Igwe that his home restoration would be completed by December 2, 2011, and advised him that his living expense coverage under the policy would end on that date.  (Id.)

       19.    At trial, McAtee stated that Safeco agreed to pay a per diem to Igwe for the time period between March 10, 2011, and July 25, 2011, contravening Safeco's policy of requiring receipts.  McAtee stated that he authorized the payment because Igwe claimed he did not have any receipts; McAtee instead authorized payment after receiving the spreadsheet from Igwe requesting expenses incurred by four people eating three meals per day.  McAtee testified that he never instructed Igwe to request per diem expenses for his wife or children on days which he did not provide them with three meals a day, that Igwe's representations led him to believe that his wife and children were living with him, and that Igwe created the spreadsheet that he e-mailed to McAtee.

20. On September 2, 2011, Safeco issued Igwe a check in the amount of $17,200.00 to reimburse him for per diem expenses allegedly accrued on behalf of his wife and minor children. (Def. Ex. D-2 at 1.)

21. McAtee testified at trial that he believed, based upon the reasons Igwe stated for declining each of the rental housing options offered to him by CRS, as well as the per diem requests Igwe made in his August 15, 2011 e-mail (Def. Ex. D-4), that Igwe's wife and children were living with him. McAtee repeatedly stated that Safeco would not have approved two hotel rooms daily if it had known that Igwe was not living with his wife and children; rather, it would only have approved payment for two hotel rooms when Igwe's children came to visit him.

22. On January 25, 2012, Safeco received an invoice from CRS detailing the payments it made to secure housing for Igwe. (Def. Ex. 6 at 1.) Safeco paid a total of $76,978.43, to cover two hotel rooms per day for Igwe and his family, for the time between March 10, 2011, and November 3, 2011. (Id. at 1–2.)

23. At trial, McAtee testified that CRS paid the hotels on Safeco's behalf, and sought payment from Safeco for the hotels. Igwe never received a bill or tendered payment for any of the $76,978.43 paid towards hotel expenses, nor was he reimbursed any of these expenses.

24. On July 12, 2012, Safeco issued a check to Igwe in the amount of $12,970.46 to reimburse him for his stay at the Omni Hotel between November 6,

2011, and December 2, 2011.  (Def. Ex. D-3 at 1.)  At trial, Igwe introduced receipts indicating payment of $13,601.00 for his stay at the hotel, which lasted between November 6, 2011, and December 6, 2011.  (Pl. Ex. D-3 at 1.Def. Ex. D-7.)  McAtee testified at trial that Igwe was not reimbursed the full amount, because his loss of use payments were scheduled to end on December 2, 2011.

25. The Court finds that there was confusion at Safeco regarding the adjustment of Igwe's claim.  It was clear to Safeco that when the water incident occurred, Igwe's wife normally resided in San Antonio with their two children.  However, there was a lack of coordination among employees with regard to the investigation and adjustment of Igwe's claim, particularly when the claim was transferred to McAtee.

26. The Court further finds that Safeco acted in good faith in attempting to relocate Igwe.  On numerous occasions, Igwe turned down the opportunity to relocate into temporary housing, stating that the housing options did not meet his family's needs.  He also turned down hotel options, stating that these options did not meet his family's needs.

27. The Court finds that Igwe's later statement that he needed two rooms to store his children's clothes and toys is not credible, where Safeco reimbursed Igwe for travel back and forth to his home for the duration of his stay in various

hotel rooms.  The Court finds Igwe intentionally lied to Safeco and misrepresented his wife and children's living situation.

## II.     CONCLUSIONS OF LAW

### A. Whether the Law-of-the-Case Doctrine Applies

28.     Igwe contends that the law-of-the-case doctrine does not apply here. (Dkt. # 73; Dkt. # 78 at 1.)   Specifically, Igwe urges the Court to reject Judge Yeakel's finding that Igwe committed fraud with respect to his request for per diem payments for meals from March 10, 2011, to July 25, 2011.  (Dkt. # 73 ¶ 1.)

29.     "Under the 'law of the case' doctrine, a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation." Thyssen Steel Co. v. M/V Kavo Yerakas, 911 F. Supp. 263, 268 (S.D. Tex. 1996) (quoting Knotts v. U.S., 893 F.2d 758, 761 (5th Cir. 1990)).  However, where a Court's prior order is interlocutory and lacks res judicata effect, application of the law-of-the-case doctrine is discretionary. United States v. Palmer, 122 F.3d 215 (5th Cir. 1997).  "The law-of-the-case doctrine does not . . . set a trial court's prior rulings in stone, especially if revisiting those rulings will prevent error." Id. at 220 (citing United States v. Horton, 622 F.2d 144, 149 (5th Cir. 1980)).  A court, in an exercise of discretion, may decline to apply the law-of-the-case doctrine. Palmer, 122 F.3d at 220 ("[I]n civil cases a district court is not precluded by the law-of-the-case doctrine from reconsidering

previous rulings on interlocutory orders such as summary judgment motions, as those rulings are not immutable and lack res judicata effect"); see also Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 185 (5th Cir. 1990). Accordingly, this Court will separately address the issues of fraud and contract interpretation to determine whether the law of the case doctrine should apply.

### 1. Whether Igwe Committed Fraud with Regard to Per Diem Requests

30.     In the state of Texas, an insurer must prove five elements to prevail on a fraud claim: "(1) the making of the representation; (2) the falsity of the representation; (3) reliance thereon by the insurer; (4) the intent to deceive on the part of the insured . . . ; and (5) the materiality of the representation." Mayes v. Mass. Mut. Life Ins. Co., 608 S.W. 2d 612, 616 (Tex. 1980); see also Albany Ins. Co. v. Anh Thi Kieu, 927 F.2d 882, 891 (5th Cir. 1991).  This test highlights "the requirement that the insurer plead and prove the insured's intent to deceive." Albany Ins. Co., 927 F.2d at 891; (citing Soto v. So. Life & Health Ins. Co., 776 S.W.2d 752, 756 (Tex. App. 1989).

31.     At trial, Safeco presented evidence to the Court that Igwe frequently represented his need for housing and meal reimbursement on behalf of his family. Particularly after McAtee took over adjusting the claim, Igwe made it clear to Safeco that his two children and wife were residing with him, full-time, in Austin.

Further, Igwe rejected housing options provided to him by CRS on numerous occasions, stating that these options did not meet the needs of his <u>family</u>.

32.   Igwe's representations corroborated the detailed reimbursement claims he submitted to McAtee for per diem expenses on behalf of his wife and two minor children.  Igwe admitted at trial that his wife and two minor children resided in San Antonio and visited only on the weekends, and that he was not, in fact, providing three meals a day to his family on a daily basis during the time period between March 10, 2011, and July 25, 2011, for which he requested per diem payments.  Igwe's representation—that he required reimbursement for providing breakfast, lunch, dinner, and incidentals for his wife and two children on a daily basis during that time period—was false.

33.   Safeco clearly relied upon Igwe's representation when it paid him $17,200; McAtee sent a spreadsheet to Igwe detailing that the per diem amount was calculated by allotting $4,300.00 per person to cover daily meal expenses for Wilma, Chinedu, Chima, and Charles Igwe.  (Def. Ex. D-5.)  Clearly, Safeco would not have authorized a $17,200 per diem for the time period had Igwe requested reimbursements only as to his own costs.

34.   Igwe is a sophisticated businessman and testified at trial that he holds a Bachelor's Degree of Science in Engineering and a Master's Degree in Business.  The Court does not find Igwe's testimony regarding his confusion as to per diem

costs, or his understanding that he could claim expenses for family members not living with him, to be credible.  The evidence shows that Igwe was well aware of what he was doing when he claimed daily meal expenses for his wife and children, predicated on Safeco's understanding that Igwe's wife and two minor children were residing with him.  Accordingly, Igwe's representation with regard to the per diem payments was made with the intent to deceive.

35.     Finally, Igwe's false representation to Safeco was material.  Whether Igwe was providing three meals a day to his wife and children was germane to Safeco's decision to issue him $17,200 in per diem payments, or a lesser amount for only his expenses.  The Court further finds that Igwe turned down the opportunity to relocate into temporary housing, continuing to request two hotel rooms on behalf of his family in order to collect per diem expenses to which he was not legally entitled.

36.     After its own evaluation of the evidence at trial, this Court finds Judge Austin's Report and Recommendation, as adopted by Judge Yeakel, correctly found that Igwe committed fraud in seeking to recover per diem meal expenses that he did not actually incur.  (Dkt. # 27 at 11.)  The Court adopts this determination as the law of the case.

## 2. Whether Fraud Renders the Insurance Contract Void

37. Safeco argues that Igwe's fraudulent representation with regard to his per diem expenses renders the insurance contract void, and obligates Igwe to repay in full the $76,978.43 paid to CRS Temporary Housing on Igwe's behalf for hotel stays between March 10, 2011, and November 3, 2011, and further requires Igwe to repay in full the $12,970.46 Safeco reimbursed Igwe for his stay at the Omni Hotel in Austin between November 6, 2011 and December 2, 2011.

38. Judge Austin addressed this issue in Report and Recommendation, finding that:

> [t]he policy language in this case clearly provides that Safeco had the right to deny coverage on a claim if Igwe misrepresented any material fact in connection with the presentation or settlement of the claim, even if the fraud occurred after a loss or claim. It also grants Safeco the right to seek recovery of payments already made.

(Dkt. # 27 at 8.) Igwe does not argue that the law-of-the-case doctrine should not apply to this finding, presumably based on the assumption that the Court would conclude that fraud did not occur in this case. However, in the interest of completeness and fairness, this Court will evaluate Judge Austin's interpretation of the insurance contract to determine whether the law-of-the-case doctrine applies here. Palmer, 122 F.3d at 220

39. The Insurance Policy introduced into evidence at trial includes the following language:

> We may void this policy or deny coverage because of fraud or material misrepresentation even after a loss or *occurrence*. This means we will not be liable for any claims or damages which would otherwise be covered. If we make a payment, we may request that you reimburse us [sic] if so, you must reimburse us for any payments we may have already made.

(Policy at 59, Property and Liability Conditions (2) (emphasis in original).)

40.  Texas courts have consistently held that insurance contracts should be interpreted in the same manner as other contracts. See Trinity Univ. Ins. Co. v. Cowan, 945 S.W.2d 819, 823 (Tex. 1997) (citing Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133 (Tex. 1994)). Where an insurance contract "is worded so that it can be given only one construction, it will be enforced as written." Upshaw v. Trinity Co., 842 S.W.2d 631, 633 (Tex. 1992) (quoting Nat'l Union Fire Ins. Co. v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex. 1991)). A court "may not resort to rules of contract construction if the policy is unambiguous, that is, if it is susceptible of only one reasonable interpretation." Upshaw, 842 S.W.2d at 633.

41.  The contract between Safeco and Igwe clearly states that Safeco may deny coverage or void the Policy in the event the insured makes a fraudulent misrepresentation to Safeco. (Policy at 59.) The contract further states that Safeco retains the right to deny coverage even where the fraud does not occur until after the event causing the loss. (Id.) Finally, the Policy clearly grants Safeco the right to request reimbursement for claims paid, when these payments were made under a claim that was based upon fraud. (Id.)

17

42. The Court finds the language of the policy is exceedingly clear; it would be inappropriate to apply rules of contract interpretation to give the insurance policy a meaning different from that which is clearly stated. Accordingly, Judge Austin's Report and Recommendation, as adopted by Judge Yeakel, correctly found that the contract policy clearly gives Safeco the right to seek recovery of payments made under the policy, in the event the insured makes fraudulent representations in connection with the claim. (Dkt. # 27 at 8.) The Court adopts this determination as the law of the case.

### B. Damages

43. Applying the unambiguous policy language to the facts of the case, the Court finds that Igwe's fraudulent representations to Safeco with regard to his requests for per diem payments render the "loss of use" policy void. Pursuant to the unambiguous policy provisions, Igwe is contractually required to repay all amounts paid both to him and on his behalf under the "loss of use" policy.

44. The Court finds that Igwe is liable to Safeco for the following amounts paid under the "loss of use" policy in connection with Igwe's March 10, 2011 claim:

- a. Safeco directly reimbursed Igwe **$17,200.00** for per diem expenses between March 10, 2011, and July 25, 2011 (Def. Ex. D-2);

- b. Safeco paid CRS Temporary Housing **$76,978.43** on Igwe's behalf to cover temporary housing between March 10, 2011, and November 3, 2011 (Def. Ex. D-6);

  c. Safeco directly reimbursed Igwe **$12,970.46** for his stay at the Omni hotel between November 6, 2011, and December 2, 2011 (Def. Ex. D-3).

The sum of these costs is **$107,148.89**.

## ORDER

Based on the foregoing findings of fact and conclusions of law, the Court **ORDERS** that judgment be entered in favor of Counter-Plaintiff Safeco and against Counter-Defendant Charles Igwe **in the amount of $107,148.89**. Each party shall bear its own attorney's fees and costs.

  **IT IS SO ORDERED.**

  **DATED:** Austin, Texas, March 3, 2016.

_____
David Alan Ezra
Senior United States Distict Judge